2012 ME 63

**STATE of Maine**

v.

**Jeffrey L. WILLIAMS.**

Supreme Judicial Court of Maine.

Argued: Feb. 16, 2012.

Decided: May 3, 2012.

912

Joel Vincent, Esq. (orally), Vincent, Kantz, Ruffner & Pittman, LLC, Portland, on the briefs, for appellant Jeffrey Williams.

William J. Schneider, Attorney General, and Donald W. Macomber (orally), Asst. Atty. Gen., Augusta, on the briefs, for appellee State of Maine.

Panel: SAUFLEY, C.J., and ALEXANDER, LEVY, SILVER, MEAD, GORMAN, and JABAR, JJ.

ALEXANDER, J.

[¶ 1] Jeffrey L. Williams appeals from a judgment convicting him of intentional or knowing murder, 17–A M.R.S. § 201(1)(A) (2011),[1] and conspiracy to commit murder (Class A), 17–A M.R.S. § 151(1)(A) (2011),[2] entered in the Superior Court (York County, *Brennan, J.*) following a joint jury trial.[3]

[¶ 2] Williams argues that (1) he was denied a fair trial when the court denied his motion to sever the trial, or, in the alternative, to hold a joint trial but with a separate jury for each defendant; (2) the court erroneously prohibited cross-examination of a cooperating witness regarding his prior arrests; (3) the prosecutor improperly vouched for the cooperating witness's credibility; and (4) the evidence was insufficient to support the convictions of murder and conspiracy to commit murder. We affirm Williams's convictions.

---

1. Title 17–A M.R.S. § 201(1)(A) (2011) provides:

 1. A person is guilty of murder if the person:
 A. Intentionally or knowingly causes the death of another human being.

2. Title 17–A M.R.S. § 151(1)(A) (2011) provides:

 1. A person is guilty of criminal conspiracy if, with the intent that conduct be performed that in fact would constitute a crime or crimes, the actor agrees with one or more others to engage in or cause the performance of the conduct and the most serious crime that is the object of the conspiracy is:
 A. Murder. Violation of this paragraph is a Class A crime.

3. Williams was tried jointly with his sister, Darlene George, who also was convicted of intentional or knowing murder and conspiracy to commit murder. *See State v. George,* 2012 ME 64, 52 A.3d 903.

## I. CASE HISTORY

[¶ 3] Viewing the evidence in the light most favorable to the State, the jury rationally could have found the following facts beyond a reasonable doubt. *See State v. Townsend*, 2009 ME 106, ¶ 2, 982 A.2d 345.

[¶ 4] In the late hours of June 19, 2008, and into the early morning hours of June 20, Jeffrey Williams, Darlene George, and Rennie Cassimy staged a simulated home invasion and killed George's husband.

[¶ 5] George owned several parcels of real estate in Maine and in New York City. She had discovered that the victim was having an extramarital affair and was concerned that the victim was planning to divorce her. To avoid dividing her marital property in a potential divorce, George informed Cassimy, with whom she was having an extramarital affair, that the victim "[h]ad to go" and she "wanted him out." George recruited Cassimy and Williams, her brother, to help kill the victim. Both Williams and Cassimy lived in or near New York City. George, Williams, and Cassimy planned and discussed the details of the home invasion and murder in New York approximately one week prior to the murder.

[¶ 6] On June 19, 2008, Williams and Cassimy traveled by bus from New York City to Portland. Security cameras at the Portland Transportation Center recorded Williams, who was wearing a burgundy football jersey, and Cassimy exiting the bus upon arrival. At approximately 4:30 p.m., George picked them up some distance from the bus terminal to avoid being recorded on the security cameras. After purchasing beer, George dropped Williams and Cassimy off at a motel near her house in Old Orchard Beach.

[¶ 7] As planned, at approximately 6:00 p.m., George took her thirteen-year-old son from a previous marriage on a series of errands. With the victim at work until after 12:00 a.m., the Georges' house was empty. From the motel, Williams and Cassimy walked to the Georges' house, entered, and prepared to execute their plan. Earlier that day, George had purchased two masks and a camouflage backpack for Williams and Cassimy to use during the home invasion. Williams and Cassimy could not locate the masks in the house. Instead, they covered their faces with black nylon stockings that they found in the house and put on latex gloves that George had left for them.

[¶ 8] Proceeding with the plan, George and her son returned home at approximately 11:00 p.m. Williams grabbed George's son, took him to the adults' bedroom, and tied him up with a sheet on the bed. George was taken to the same room and tied up with a sheet. Williams and Cassimy, who were using fake accents, demanded drugs and money.

[¶ 9] The victim returned home from work at approximately 1:00 a.m. Shortly after the victim entered the home, Williams punched him in the face and dragged him down to the basement. George and her son could hear the victim being attacked and then dragged to the basement. Once in the basement, Williams proceeded to hog-tie the victim with a synthetic rope and forced a plastic bag over his head. The victim died from asphyxiation. To confirm that the victim was dead, Cassimy cut a hole in the plastic bag and poured rum down his throat to see if he would react. After the victim failed to react, Cassimy left the bottle lodged in his throat.

[¶ 10] Williams and Cassimy left the house, took the victim's car, and abandoned it in a nearby restaurant parking lot. Later that morning, Williams and Cassimy took a cab to Portland and returned to New York by bus.

[¶ 11] At approximately 5:45 a.m., George called 911 and reported a robbery. Later that day, George provided details about the alleged home invasion during interviews with police officers. George described three assailants, all with black nylon stockings covering their faces, to the officers: (1) a man wearing a brown professional sports jersey; (2) a man wearing a blue t-shirt; and (3) a man wearing a burgundy polo shirt or t-shirt.

[¶ 12] Before there were any indictments in the case, George testified, pursuant to subpoenas, before the York County grand jury on July 7, 2008, and on September 2, 2008. At the July proceeding, George again described the three assailants as wearing a brown jersey, a blue t-shirt, and a burgundy t-shirt; however, George stated that the brown jersey was similar to a football jersey with writing on the back. By the time of her grand jury appearance on September 2, George was a focus of the State's investigation as a potential suspect in the homicide.

[¶ 13] On September 5, 2008, Williams and Cassimy were indicted for intentional or knowing murder, 17–A M.R.S. § 201(1)(A), or depraved indifference murder, 17–A M.R.S. § 201(1)(B). A superseding two-count indictment was filed on March 4, 2009, containing counts for murder, 17–A M.R.S. § 201(1)(A), (B), and conspiracy to commit murder, 17–A M.R.S. § 151(1)(A). Williams and Cassimy pleaded not guilty to both counts.

[¶ 14] On March 4, 2009, George was indicted for intentional or knowing murder, 17–A M.R.S. § 201(1)(A), or depraved indifference murder, 17–A M.R.S. § 201(1)(B), and conspiracy to commit murder, 17–A M.R.S. § 151(1)(A). George pleaded not guilty to both counts.

[¶ 15] In March 2009, the State filed a notice of joinder, pursuant to M.R.Crim. P. 8(b), to join Williams, George, and Cassimy for trial. On August 3, 2009, Williams moved, pursuant to M.R.Crim. P. 8(d), to sever the trials. The grounds for his motion were the anticipated offering by the State of (1) George's statements that were made pre-conspiracy; (2) George's statements to the officers on the morning of June 20, 2008; and (3) George's grand jury testimony. If the court deemed the severance of the joint trial unnecessary, Williams requested that the court consider conducting one trial but with separate juries.[4] After a hearing, the court denied Williams's motion to sever and, in turn, his request for one trial with separate juries. The court also determined by a preponderance of the evidence that George's interviews with the officers on June 20, 2008, were in furtherance of the conspiracy. This determination meant that George's statements to the police on June 20, 2008, could be introduced against Williams at trial. *See State v. Quirion*, 2000 ME 103, ¶ 18, 752 A.2d 170.

[¶ 16] On January 26, 2010, Cassimy entered an agreement to plead guilty to conspiracy to commit murder, 17–A M.R.S. § 151(1)(A), and began to cooperate with the State.

[¶ 17] Williams and George's ten-day trial was held in June 2010. At the trial, Cassimy testified in detail about the codefendants' conspiracy and subsequent execution of their plan. As was her right, George chose not to testify. Williams elected to testify.

[¶ 18] Williams testified that he traveled to Maine with Cassimy on June 19, 2008, in order to spend time with his sister and work on her house. Williams testified

4. Effectively, the trial would proceed with two juries impaneled, each jury assigned to hear and weigh evidence only against one codefendant. *See State v. Bowman*, 588 A.2d 728, 733–34 (Me.1991).

that the visit did not go as he had expected; Cassimy and George left Williams in the motel all night. Williams testified that he returned to New York with Cassimy early the next morning without speaking to his sister because he was agitated that she had not spent time with him as planned.

[¶ 19] The jury found Williams and George guilty of murder and conspiracy to commit murder. Williams was sentenced to life in prison for murder and thirty years for conspiracy, to be served concurrently. George was sentenced to forty years for murder and thirty years for conspiracy, to be served concurrently. Both Williams and George timely appealed their convictions. George's conviction is affirmed in a separate opinion issued concurrently with this opinion, *State v. George,* 2012 ME 64, 52 A.3d 903.

## II. LEGAL ANALYSIS

### A. Denial of Motion to Sever

[¶ 20] When a trial court acts upon a defendant's motion to sever or the State's motion for joinder, the trial court has "substantial discretion," and we will uphold its decision "unless it is demonstrated that the decision is an improper exercise of its discretion and prejudice is shown." *State v. Cook,* 2010 ME 81, ¶ 15, 2 A.3d 313 (quoting *State v. Parsons,* 2005 ME 69, ¶ 13, 874 A.2d 875).

[¶ 21] Defendants "who are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting a crime or crimes" may be joined in one trial. M.R.Crim. P. 8(b). Joint trials are favored to "promote economy and efficiency and to avoid a multiplicity of trials, where these objectives can be achieved without substantial prejudice to the right of the defendants to a fair trial." *State v. Lakin,* 2006 ME 64, ¶ 8, 899 A.2d 777 (quoting *Bruton v. United States,* 391 U.S. 123, 132 n. 6, 88

S.Ct. 1620, 20 L.Ed.2d 476 (1968)). The trial court must balance the general policy in favor of joint trials against any prejudice to a defendant that may result. *Parsons,* 2005 ME 69, ¶ 13, 874 A.2d 875; *State v. Boucher,* 1998 ME 209, ¶ 9, 718 A.2d 1092.

[¶ 22] A defendant opposing joinder may show prejudice to his right to a fair trial by showing that either (1) "his defense is irreconcilable with that of his co-defendant or" (2) "the jury will be unable to compartmentalize the evidence as it relates to the separate defendants." *United States v. Washington,* 318 F.3d 845, 858 (8th Cir.2003). The party moving for severance has the burden to demonstrate, prior to trial, that a joint trial would result in prejudice. *Lakin,* 2006 ME 64, ¶ 8, 899 A.2d 777.

[¶ 23] To show the requisite prejudice, Williams challenges the admission of, and jury instructions relating to, three types of George's statements: (1) statements made pre-conspiracy; (2) statements found to have been made after the homicide, but made during the course and in furtherance of the conspiracy; and (3) statements made to the grand jury. Because the law is distinct for each of these types of statements, we discuss them separately. We note at the outset, however, that, as Williams conceded at oral argument, none of the statements at issue constituted a non-testifying codefendant's statement that implicated Williams in commission of the crimes.

### 1. Pre–Conspiracy Statements

[¶ 24] The pre-conspiracy statements at issue are statements that George made to Cassimy regarding their intimate relationship and her marriage to the victim. The statements are (1) "I love you more today than yesterday"; (2) her marriage was not good; (3) the victim wanted

a divorce; and (4) the victim "wanted to sell one of the home[s] and let her live in one of the home[s]." Additionally, Williams challenges an officer's testimony that the officer listened to over 350 phone calls between George and Cassimy, and provided specific examples of their intimate conversations. None of the reported conversations referenced Williams.

[¶ 25] Williams argues that George's pre-conspiracy statements, which were admitted through testimony from Cassimy and the officer, violated his Sixth Amendment right to confront witnesses, because the statements provided a motive for the conspiracy without affording Williams an opportunity to cross-examine George. Williams further asserts that the jury should have been instructed to consider the evidence only against George because the statements, which revealed George and Cassimy's intimate relationship, did not concern Williams.

[¶ 26] The Confrontation Clause of the Sixth Amendment of the United States Constitution, extended to the States by the Fourteenth Amendment, provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." [5] U.S. Const. amend. VI; *see Pointer v. Texas*, 380 U.S. 400, 403, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965) (stating that the Confrontation Clause applies to the States). Consequently, out-of-court testimonial statements by witnesses who are unavailable for cross-examination are inadmissible. *See Crawford v. Washington*, 541 U.S. 36, 61, 68–69, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004); *State v. Rickett*, 2009 ME 22, ¶ 10, 967 A.2d 671; *State v. Barnes*, 2004 ME 105, ¶ 8, 854 A.2d 208.

[¶ 27] An out-of-court statement is testimonial when it is a "solemn declaration or affirmation made for the purpose of establishing or proving some fact." *State v. Ducasse*, 2010 ME 117, ¶ 10, 8 A.3d 1252 (quoting *Crawford*, 541 U.S. at 51, 124 S.Ct. 1354). If a statement was made under circumstances that would lead an objective witness reasonably to believe that the statement would be available for use at a later trial, then the statement is testimonial for the purposes of the Confrontation Clause. *Melendez–Diaz v. Massachusetts*, 557 U.S. 305, 321, 129 S.Ct. 2527, 174 L.Ed.2d 314 (2009). We review the trial court's legal conclusions that statements are nontestimonial, and thus do not implicate the Confrontation Clause, de novo. *See Ducasse*, 2010 ME 117, ¶ 8, 8 A.3d 1252.

[¶ 28] Because George made the statements to Cassimy in private, intimate conversations, it is evident that she did not intend to establish facts that could reasonably be anticipated to be used at a later trial. Williams was not unfairly prejudiced by the court's lack of instructions to the jury to consider the evidence only against George, because the statements, offered in evidence to show motive, *see* M.R. Evid. 801(c), are relevant and admissible against both defendants, *see* M.R. Evid. 402.

2. Statements Made During the Course and in Furtherance of Conspiracy

[¶ 29] Williams asserts that the target act of the conspiracy, the murder of the victim, had been completed prior to George's statements to the police later in the morning of June 20, 2008. Accordingly, Williams argues, George's statements to the officers on the morning of June 20, 2008, were not made during the course and

5. The Maine Constitution provides that "[i]n all criminal prosecutions, the accused shall have a right to ... be confronted by the witnesses against the accused." Me. Const. art. I, § 6.

in furtherance of the conspiracy, and thus, fall outside the hearsay exception for coconspirator statements and are subject to the Confrontation Clause.

[¶ 30] We review for clear error or abuse of discretion a court's decision to admit statements made by alleged coconspirators found to have been made during the course and in furtherance of a conspiracy. *See Quirion,* 2000 ME 103, ¶ 19, 752 A.2d 170. A coconspirator's statement made during the course and in furtherance of the conspiracy is not hearsay and, in turn, does not violate the Confrontation Clause. *See* M.R. Evid. 801(d)(2)(E); [6] *Bourjaily v. United States,* 483 U.S. 171, 181–82, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987). For a coconspirator's out-of-court statement to be admissible, the court must find by a preponderance of evidence that "(1) the statement was made during the course of a conspiracy; (2) the statement was made in furtherance of the conspiracy; and (3) the defendant participated in the conspiracy." *Quirion,* 2000 ME 103, ¶ 18, 752 A.2d 170. To be "in furtherance," the coconspirator's statements must be "designed to promote or facilitate achievement of the goals of the ongoing conspiracy, as by, for example, ... prompting the listener—who need not be a coconspirator—to respond in a way that promotes or facilitates the carrying out of a criminal activity." *United States v. Tracy,* 12 F.3d 1186, 1196 (2nd Cir. 1993).

[¶ 31] Coconspirator statements are not admissible if the objectives of the conspiracy have concluded. *See Krulewitch v. United States,* 336 U.S. 440, 442, 69 S.Ct. 716, 93 L.Ed. 790 (1949); Field & Murray, *Maine Evidence* § 801.8 at 446 (6th ed.2007). However, a coconspirator's acts of concealment of the conspiracy after

the target objective has been achieved may qualify as being in furtherance of the conspiracy. *See Grunewald v. United States,* 353 U.S. 391, 405, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957) (distinguishing between acts of concealment performed in furtherance of a conspiracy and acts of concealment for the sole purpose of covering up the crime); *see, e.g., United States v. Serrano,* 870 F.2d 1, 7–9 (1st Cir.1989) (finding that statements made during a deposition eight months after the objective was achieved were not in furtherance of conspiracy); *United States v. Medina,* 761 F.2d 12, 17–18 (1st Cir.1985) (finding that defendant's efforts to destroy incriminating evidence was in furtherance of the conspiracy); *compare State v. Booth,* 250 Conn. 611, 737 A.2d 404, 423 (1999) (finding that defendant's statement made while fleeing the scene to avoid police was in furtherance of conspiracy); *with Krulewitch,* 336 U.S. at 442–44, 69 S.Ct. 716 (finding that statements made over a month after the objective was attained were not in furtherance of the conspiracy because the statements aimed to prevent punishment).

[¶ 32] The trial court's determination, by a preponderance of the evidence, that George's statements to the officers hours after the murder were made during the course and in furtherance of the conspiracy is supported by the record. The evidence indicates that George called 911, as planned, on the morning of June 20, 2008, alerting law enforcement that there had been a robbery. As would be anticipated, George was later interviewed by the officers and related the details of the home invasion, including misleading descriptions of the assailants. George's affirmative act of concealing the identities of the assailants from the officers, a few hours after

---

6. Rule 801(d)(2)(E) of the Maine Rules of Evidence provides that "[a] statement is not hearsay if ... [t]he statement is offered against a party and is ... a statement by a coconspirator of a party during the course and in furtherance of the conspiracy."

the target objective was complete, was executed in furtherance of the conspiracy.

### 3. George's Redacted July Grand Jury Testimony

██ [¶ 33] Williams argues that he was prejudiced by (1) the court's insufficient instructions to the jury to consider George's redacted July grand jury testimony only as evidence against George, and (2) the State's cross-examination of him using evidence that is only found in the redacted grand jury testimony, excluded as to him.

 [¶ 34] Prior testimony of a codefendant, who does not take the stand, that is "introduced at a joint trial is not considered to be . . . 'against' a defendant if the jury is instructed to consider that testimony only against a codefendant." *Richardson v. Marsh*, 481 U.S. 200, 206, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987); *see State v. Bridges*, 2004 ME 102, ¶ 10, 854 A.2d 855 (jurors are presumed to follow the jury instructions including curative instructions); *United States v. Gentles*, 619 F.3d 75, 82 (1st Cir.2010) (same). However, the admission of a non-testifying codefendant's confession that implicates a defendant in a joint trial violates the defendant's right of confrontation and cannot be cured by limiting instructions. *See Bruton*, 391 U.S. at 135–36, 88 S.Ct. 1620 ("[t]here are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored.").

██ [¶ 35] If a codefendant's confession is "redacted to eliminate not only the defendant's name, but any reference to his

or her existence," coupled with a *proper* limiting jury instruction, the Confrontation Clause is not violated. *Richardson*, 481 U.S. at 211, 107 S.Ct. 1702; *see* M.R. Evid. 105;[7] *cf. Boucher*, 1998 ME 209, ¶¶ 5, 16, 718 A.2d 1092 (stating that the defendant's redacted name from his codefendant's confession obviously referred directly to the defendant, thus the Confrontation Clause was violated).

[¶ 36] On this record, it does not appear that Williams suffered prejudice in the way described in *Bruton*. During George's grand jury testimony, she did not confess to the conspiracy to murder the victim, accuse Williams of the crime, or describe Williams's culpability in any way. Moreover, the grand jury testimony was significantly redacted to exclude George's statements regarding the extent of Williams's relationships with Cassimy or the victim.

[¶ 37] Williams further argues that he was unfairly prejudiced when the prosecutor cross-examined him regarding the color and type of jersey that he was wearing on June 19, 2008. Specifically, Williams argues that the prosecutor improperly used the descriptive terms "burgundy" and "football" found only in George's grand jury testimony.

[¶ 38] A review of the record indicates that George described a man wearing a brown professional sports jersey in the interview with the officers on June 20, 2008, which was admissible as evidence against Williams, and she described the same man as wearing a brown football jersey in her grand jury testimony, which was inadmissible as evidence against Williams. In both statements, George described a third man who was wearing a

---

**7.** Rule 105 of the Maine Rules of Evidence provides, in pertinent part, that "[i]n a criminal case tried to a jury evidence inadmissible as to one defendant shall not be admitted as to other defendants unless all references to the defendant as to whom it is inadmissible have been effectively deleted."

burgundy shirt. The record also shows that Williams identified himself in a photograph, which had been admitted in evidence, showing him arriving at the Portland bus terminal wearing a burgundy football jersey. Considering that a photograph of Williams wearing a burgundy football jersey at the bus station was properly admitted in evidence, the prosecutor's use of the term "football" and "burgundy" during cross-examination did not necessarily refer to evidence excluded as to Williams or require a severance of trials.

[¶ 39] Because the record does not show a violation of *Bruton* and because Williams was not unfairly prejudiced by the State's cross-examination, the court's limiting instructions to the jury to consider the redacted grand jury testimony only against George was sufficient to protect Williams's right to a fair trial.

[¶ 40] In summary, the court did not abuse its discretion in denying Williams's motion to sever.

### B. Cross–Examination of the Cooperating Witness

[¶ 41] Williams argues that the court erred by prohibiting cross-examination of Cassimy regarding previous arrests after Cassimy opened the door by stating that he "was not that kind of person, that is why [he had] never been in trouble." Specifically, Williams argues that M.R. Evid. 608(b) and 609 did not control, and as such, he should have been permitted to impeach Cassimy regarding arrests in Trinidad that did not result in convictions.

[¶ 42] We review decisions on admissibility of evidence for an abuse of discretion. *See State v. Ericson,* 2011 ME 28, ¶ 19, 13 A.3d 777. Pursuant to M.R. Evid. 608(b), a witness's credibility may be attacked "through cross-examination on specific instances of the witness's prior conduct that are probative of truthfulness or untruthfulness...." *Id.* ¶ 20 (citing Field & Murray, *Maine Evidence* § 608.2 at 299 (6th ed.2007)). Pursuant to M.R. Evid. 609, a witness may be impeached by evidence that the witness was *convicted* of a crime.

[¶ 43] Cassimy's prior arrests are not admissible pursuant to M.R. Evid. 608(b) because his prior arrests for possession of a firearm and assault do not concern his character for truthfulness or untruthfulness. Pursuant to M.R. Evid. 608(b), a court may, in its discretion, allow a cross-examiner to ask a witness about specific instances of conduct for the purpose of attacking the witness's credibility. Here, Williams wanted to use Cassimy's arrests to undermine his statements that he was not "the kind" of person to get involved in a murder conspiracy. Because that assertion was the focus, and not Cassimy's credibility, M.R. Evid. 608(b) was not implicated. Maine Rule of Evidence 609 is not applicable in this case because the record indicates that Cassimy was arrested, but not convicted, in Trinidad during the 1990s.

[¶ 44] Finally, in excluding the evidence of prior arrests, the trial court reasoned that the arrests were "remote" and the jury would be able to make a determination of Cassimy's credibility "based on his admission and plea to conspiracy to commit murder in this case." The court acted well within its discretion in deciding that the probative value of Cassimy's prior arrests was substantially outweighed by considerations of time, relevancy, and jury confusion. *See* M.R. Evid. 403. The court did not abuse its discretion in prohibiting cross-examination of Cassimy regarding his arrests in Trinidad.

### C. Vouching for the Cooperating Witness's Credibility

[¶ 45] Williams next argues that the prosecutor improperly vouched for

Cassimy's credibility with statements regarding dates and times of events in an effort to bolster his testimony. Because Williams did not object to the prosecutor's statements at trial, we review Williams's current claim of prosecutorial misconduct for obvious error. *See* M.R.Crim. P. 52(b); *State v. Chesnel,* 1999 ME 120, ¶ 32, 734 A.2d 1131.

[¶ 46] At trial, an attorney is prohibited from commenting on his or her personal opinion as to the credibility of a witness. M.R. Prof. Conduct 3.4(e); *see State v. Schmidt,* 2008 ME 151, ¶ 16, 957 A.2d 80; *State v. Ashley,* 666 A.2d 103, 105 (Me. 1995); *United States v. Perez–Ruiz,* 353 F.3d 1, 9 (1st Cir.2003) ("A prosecutor improperly vouches for a witness when she . . . impart[s] her personal belief in a witness's veracity or impl[ies] that the jury should credit the prosecution's evidence simply because the government can be trusted.").

[¶ 47] At trial, Cassimy was unable to testify to specific dates and times on numerous occasions. On three occasions, the prosecutor made reference to Cassimy's inability to testify to dates and time: (1) during re-direct examination, the prosecutor stated "And I understand you have a hard time with dates"; (2) during closing argument, the prosecutor stated "Cassimy is lousy on dates and times, we can all agree on that"; and (3) also during closing arguments, arguing that a coconspirator meeting occurred on a specific date at a specific time, the prosecutor stated

> [Cassimy is] lousy on dates and times, and he was wrong. That meeting had to have occurred if you look at the cell phone records late in the afternoon of Saturday June 14th because there was a period of time in which [George], [Cassimy] and [Williams] simply weren't calling each other . . . I anticipate the lawyers are going to get up here and say [Cassimy] was so wrong about this, you

need to disregard all of his testimony, and I am going to say to you once again that he was lousy on dates and times, and if you feel that alone causes you to disregard his testimony you certainly can do so, but I will concede to you that he's lousy on dates and times, but he is accurate about other details.

[¶ 48] Williams's contention of prosecutorial misconduct is without merit. In all three instances, the prosecutor was summarizing Cassimy's testimony that he could not provide dates and times for the events in question. The prosecutor did not make a personal assertion that Cassimy was truthful and credible or invoke the prestige of government. To the contrary, in closing arguments, the prosecutor acknowledged that Cassimy recalled dates poorly and urged the jury to weigh this factor in their consideration. The comments by the prosecutor did not constitute improper vouching.

## D. Sufficiency of the Evidence

[¶ 49] We review the sufficiency of the evidence in the light most favorable to the State to determine whether the jury could have found beyond a reasonable doubt each of the elements of the crimes charged. *State v. Severy,* 2010 ME 126, ¶ 8, 8 A.3d 715. The fact-finder is permitted to draw all reasonable inferences from the evidence. *State v. Medeiros,* 2010 ME 47, ¶ 16, 997 A.2d 95. To that end, the fact-finder is free to selectively accept or reject testimony presented based on the credibility of the witness or the "internal cogency of the content." *State v. Mahaney,* 437 A.2d 613, 621 (Me. 1981).

[¶ 50] Viewed in the light most favorable to the State, the record contained more than sufficient evidence to support the jury's finding that Williams conspired with George and Cassimy to

murder the victim and, then, carried out the crime. *See* 17–A M.R.S. § 201(1)(A); 17–A M.R.S. § 151(1)(A).

The entry is:

Judgment affirmed.